IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,           )
                             )
vs.                          )    CASE NUMBER:    **26–mj–4036 RJD**
                             )
RUOYU LIAN,                  )
                             )
        Defendant.           )

## CRIMINAL COMPLAINT

I, John Epple, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### COUNT 1
### WIRE FRAUD – 18 U.S.C. § 1343

On or about July 7, 2026, in Williamson County, Illinois, within the Southern District of Illinois,

### RUOYU LIAN,

defendant herein, knowingly devised and participated in a scheme to defraud D.B., and to obtain money and property belonging to D.B. by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme to defraud, and attempting to do so, knowingly did cause to be transmitted by means of a wire communication in interstate or foreign commerce from somewhere outside of the state of Illinois to Illinois, certain signals, namely a telephone conversation by a conspirator who identified himself as "Kevin Jones" and D.B., during which the conspirator gave D.B. instructions regarding delivering a package containing bars of gold to a courier working on behalf of the conspiracy;

In violation of Title 18, United States Code, Section 1343.

## **AFFIDAVIT**

I further state as follows:

1.      I am a Special Agent with the United States Department of Homeland Security (DHS) Homeland Security Investigations (HSI), and I have been so employed since September 2025. My duties as a Special Agent include investigations related to human trafficking, child exploitation, narcotics smuggling, criminal violations of the Immigration and Nationality Act, and financial crimes. During this current employment, I have conducted and assisted with criminal investigations of Title 18 of the United States Code. I am a graduate of the Federal Law Enforcement Training Center where I received classroom and practical training for criminal financial investigations and other related investigations. I have been involved with obtaining and retaining electronic evidence for prosecution in numerous HSI investigations. I have been the Case Agent of investigations as well as assisted in numerous investigations which have resulted in indictments, search warrants, and arrest warrants. I am vested with the authority to investigate violations of federal criminal laws as an investigative or law enforcement officer of the United States, within the meaning of Title 18, United States Code, § 2510(7). I have been assisting with investigations involving foreign nationals and foreign criminal organizations targeting elderly victims across the United States through imposter or impersonation scams. Imposter scams involve scammers impersonating government officials, company representatives, or known and trusted people, to steal money and/or personal information from victims. These scams occur through various means, including phone calls, text messages, emails, and/or social media.

2.      On July 2, 2026, D.B., a 78-year-old resident of Marion, Illinois, met with investigators with the Marion Police Department ("MPD") and reported a financial scam in progress. D.B. advised that she had been informed by scammers, who were purportedly with

2

Microsoft Support and the Department of Treasury, that her accounts had been compromised and several large transactions had been sent overseas. D.B. provided additional information about the scam and her communications with the scammers to MPD. I reviewed the police reports and electronic communications between D.B. and the scammers, and determined the following:

**Victim Complaint**

3.      On or about April 2, 2026, D.B. received a notice that she had a virus on her computer. D.B. used Google to find a number for Microsoft Support. When D.B. called the number, 855-674-7220[1], she spoke with an unknown subject who identified themselves as "Mike Williams". "Mike Williams" had a foreign accent and identified himself as a supervisor for the fraud prevention team of "Microsoft." "Mike Williams" advised D.B. that her computer had been hacked or otherwise compromised and that he would help her resolve the issue. As part of this process, "Mike Williams" advised D.B. that he would need to obtain remote access to her computer and other devices. D.B. complied, and "Mike Williams" instructed her on how to grant "Mike Williams" remote access. Based on my investigation to date, I know that "Mike Williams" was not an employee of Microsoft and that D.B. was a victim of a scam. "Mike Williams" was also likely a fake name used by the scammer.

4.      During this initial conversation, "Mike Williams" began to ask D.B. about her financial accounts and informed D.B. that as a result of the compromised state of her computer, her financial accounts may also have been compromised. "Mike Williams" learned that D.B. had an investment account at Edward Jones Investments, and informed D.B. that he would transfer her

---

[1] I know that scammers involved in impersonation scams generally use phone numbers to make it appear as if they are located in and calling from the United States. Instead, the scammers are located elsewhere, usually in foreign countries. This technique is called "spoofing."

to someone with their fraud department for further instructions.

5.    On April 2, 2026, D.B. was transferred from "Mike Williams" to "Kevin Jones." "Kevin Jones" identified himself as a member of the fraud prevention team for Edward Jones. "Kevin Jones" informed D.B. that as a result of the compromised state of her computer, her financial accounts were also compromised, including her retirement account at Edward Jones. "Kevin Jones" informed D.B. that several large transactions had already been sent from her accounts to several different foreign countries. "Kevin Jones" told D.B. he would continue to monitor her Edward Jones investment account for suspicious activity.  "Kevin Jones" advised D.B. she would have to get a new social security number.

6.    At one point, "Kevin Jones" also provided D.B. with a purported non-disclosure agreement, which D.B. signed, that prevented her from discussing the fraud activity with other people, including law enforcement and family members. I know that scammers typically advise victims not to share information with family members, because family members would generally stop the victims from participating in the scam.

7.    "Kevin Jones" maintained regular communication with D.B. from April 2, 2026, through July 7, 2026.  "Kevin Jones" required D.B. to maintain regular contact with him, which included sending him a "good morning" and "good night" text each day.  D.B. would send the text messages to telephone number 805-399-0298 until May 26, 2026.  On May 26, 2026, "Kevin Jones" provided D.B. with telephone number 805-399-0998 and advised her that would be the primary number to communicate with him moving forward.

**Gold Pickups Begin**

8.    Sometime between approximately April 29, 2026, and May 3, 2026, "Kevin Jones"

informed D.B. that in order to protect her Edward Jones assets she would need to convert her assets to gold. While D.B. communicated with personnel from the real Edward Jones about her accounts, "Kevin Jones" required her to use a "tracker" phone that allowed him to listen to the conversations D.B had with Edward Jones. During these conversations, at the direction of "Kevin Jones", D.B. informed her financial advisors at Edward Jones that she would like to move $1.185 million out of her Edward Jones investment accounts into a money market account that could be used to purchase the gold.

9.      After moving funds from her investment accounts, following "Kevin Jones'" instructions, D.B. used $318,459 that she withdrew from her Edward Jones account to purchase gold from a gold supplier, CMI Gold and Silver, located in Phoenix, Arizona. D.B. placed an order from CMI Gold and Silver, and 76.54 oz of gold was shipped to D.B., consisting of six (6) 1-ounce bars and twenty (20) 100-gram bars. A picture of the gold has been attached for reference.



10. On or about May 18, 2026, D.B. received the first shipment of gold from CMI Gold and Silver and sent a picture of the gold to "Kevin Jones."

11. On June 8, 2026 "Kevin Jones" contacted D.B. and told her that an "agent" with the Department of Treasury would arrive near her home sometime between approximately 7:10 pm to 7:45 pm to pick up the gold. "Kevin Jones" instructed D.B. to video call him using the AnyDesk remote application that had been installed on her computer. "Kevin Jones" watched D.B. take the gold and package it in a box and tape the box. D.B. then placed the gold package into a bag while "Kevin Jones" watched. "Kevin Jones" provided D.B. with the code word "black bug" to exchange with the "agent." From my experience, I know that scammers direct their couriers and victims to exchange passwords when conducting the gold exchange.

12. On or about June 8, 2026, D.B. met an "agent" working on behalf of "Kevin Jones" and the Department of Treasury at Wal-Mart in Marion, Illinois and delivered the box containing approximately 76.54 oz of gold to the "agent." The "agent" provided D.B. with the code word "black bug."

13. On or about June 9, 2026, "Kevin Jones" told D.B. that she would need to place a second order of gold from CMI Gold and Silver. This time, "Kevin Jones" instructed D.B. to order $504,900 in gold. At "Kevin Jones'" direction, D.B. placed an order and received three separate shipments of gold. "Kevin Jones" told D.B. to keep the gold in a safe until he gave her further directions for the next pick up.

**Arrest Operation**

14. After receiving documents from "Kevin Jones" that did not match actual seals for federal entities, D.B. began to suspect that she was being scammed. In early July 2026, D.B.

6

contacted MPD to request assistance. On July 2, 2026, officers with MPD responded to D.B.'s residence and began their investigation. At this time, they understood that "Kevin Jones" would be attempting to arrange for an "agent" to pick up the gold that she had recently ordered.

15.    On July 6, 2026, "Kevin Jones" attempted to arrange a pickup for the same day. At the direction of law enforcement, D.B. was able to stall the pickup until July 7, 2026, while MPD formulated a plan to apprehend the "agent" picking up the package.

16.    On July 7, 2026, at approximately 08:45 a.m., "Kevin Jones" contacted D.B. via telephone number 805-399-0998. "Kevin Jones" requested that D.B. video call him using the AnyDesk remote application so he could watch D.B. package the 2 kilograms of gold that was to be delivered later in the day.   D.B. contacted "Kevin Jones," and he watched her package the gold and seal it using a United States Postal Service shipping box.   After "Kevin Jones" hung up, D.B. used a similar box and packaged it with sandbags weighing 2 kilograms. A picture of the two-kilogram bars of gold has been attached for reference.



17.    "Kevin Jones" told D.B. she would need to provide a password to the "agent" prior

to the package getting picked up. "Kevin Jones" advised D.B. the password was "Poker Queen." "Kevin Jones" did not provide a meeting location to D.B. but told her the time would be between 5:00 pm and 6:00 pm.

18.    On July 7, 2026, at approximately 05:20 pm, "Kevin Jones" contacted D.B. using telephone number 805-399-0998. "Kevin Jones" instructed D.B. to travel to Cornerstone Church, located at 2705 Walton Way, Marion, Illinois 62959. "Kevin Jones" instructed D.B. that an "agent" would approach her and expect the password "Poker Queen." The courier would then provide a dollar bill and D.B. would provide the package to the courier. D.B. was instructed to video call "Kevin Jones" to show that the package she would provide to the "agent" was the same package that she had shown him earlier with the 2-kilogram gold bars. D.B. then entered her vehicle and traveled to Cornerstone Church.

19.    On July 7, 2026, approximately 05:37pm, officers observed RUOYU LIAN's (LIAN), vehicle parked near Cornerstone Church. The vehicle, bearing a Texas license plate XJN2034, was occupied by LIAN who appeared to be traveling alone. Officers checked the details of the license plate and discovered it belonged to EAN Holdings, otherwise known as Enterprise Rental Car. Officers also discovered the vehicle was observed traveling from Cape Girardeau, Missouri, earlier in the day. Officers observed LIAN drive his vehicle onto the parking lot of Cornerstone Church.

20.    At approximately, 05:53pm, LIAN exited his vehicle and approached the front driver's side of D.B.'s vehicle. Officers then observed LIAN exchange the "poker queen" code with D.B. and take the box purportedly containing the 2-kilogram gold bars. After the exchange, officers with MPD, HSI, and the United States Postal Inspection Service took LIAN into custody.

21.    An identification purporting to be a Florida Driver License and a United States Employment Authorization Card was provided by LIAN. That identification indicated that LIAN resides in the greater Tampa, Florida area. Based on further investigation, I have determined that LIAN most recently resided in New York.

22.    Following his arrest, on July 7, 2026, LIAN was transported to the Marion Police Department for booking.

23.    Based on the foregoing, I believe there is probable cause to believe that RUOYU LIAN committed the offense set forth in Count 1 of this Complaint.

FURTHER AFFIANT SAYETH NAUGHT.

John Epple
Special Agent
U.S. Department of Homeland Security
Homeland Security Investigations

Kathleen M. Howard

KATHLEEN M. HOWARD
Assistant United States Attorney

Subscribed and sworn to this ___09 day of July, 2026, at East St. Louis, Illinois.

HONORABLE REONA J. DALY
United States Magistrate Judge
Southern District of Illinois

9